UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                  :

THE UNITED STATES OF AMERICA,     :
                                    :    **<u>MEMORANDUM DECISION AND</u>**
          -against-             :    **<u>ORDER</u>**
                                    :

DERRICK AYERS, *et al.*,            :    20-cr-239 (BMC)
                                    :

                  Defendants.     :
                                    :
-------------------------------------------------------- X

**COGAN**, District Judge.

This Order addresses the following motions:

- [1479] Defendant Franklin Gillespie's omnibus motion *in limine*;

- [1480] Defendant Anthony Kennedy's partial motion to dismiss;

- [1481] Defendant Derrick Ayers's omnibus motion *in limine*;

- [1499] Mr. Gillespie's motion for a bill of particulars;

- [1515] Mr. Ayers's partial motion to dismiss;

- [1558] Mr. Kennedy's partial motion to dismiss;

- [1482] The Government's omnibus motion *in limine*; and

- [1497] The Government's partial motion to dismiss.

The Court first addresses defendants' motions in the order they appear on the docket, followed by the Government's motions in the order they appear on the docket.

## I.    Mr. Gillespie's [1479] Omnibus Motion *in Limine*

### A.    Mr. Gillespie moves to dismiss Counts 23 and 32 for improper venue.

The Government does not dispute that Count 32, a charge based on drug possession in New Jersey, should be dismissed without prejudice for improper venue. Count 32 is therefore

dismissed as to Mr. Gillespie without prejudice for the Government to renew that charge in a proper venue.

As for Count 23, which charges Mr. Gillespie with maintaining a drug-involved premises (i.e., a stash house) in New Jersey, Mr. Gillespie contends that the essential conduct of that alleged crime took place in New Jersey, where the house in question is located. The Government counters that Mr. Gillespie committed acts in furtherance of that crime within this District, thereby establishing proper venue.

When a crime consists of discrete parts committed in different districts, such as a continuing offense that starts in one district and continues in another, venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237. In determining venue for criminal offenses, including continuing offenses that may support venue in multiple districts, "it is often helpful to look to the verbs of a statute in identifying the conduct that constitutes an offense." United States v. Ramirez, 420 F.3d 134, 138 (2d Cir. 2005). The verbs in 18 U.S.C. § 856 are open, lease, rent, use, maintain, manage, and control. Leasing property is not a discrete act, but rather establishes a continued state of tenancy – in other words, leasing necessarily takes place over a continuous period. The same is true of maintaining, managing, or using a stash house. As the Government notes, although the Second Circuit has not yet weighed in on the issue, the Ninth Circuit has held that § 856 violations constitute continuing offenses. See United States v. Mancuso, 718 F.3d 780, 792 (9th Cir. 2013). I agree with the Ninth Circuit in holding that § 856 constitutes a continuing offense.

Having made that determination, I must now consider what types of acts are "in furtherance" of that offense and whether Mr. Gillespie is alleged to have committed any of those acts within the Eastern District of New York. See United States v. Royer, 549 F.3d 886, 894 (2d

2

Cir. 2008).  A defendant furthers the offense of leasing a stash house by paying rent, and furthers

the offense of using, maintaining, or managing a stash house by controlling the flow of drugs and

drug dealers in and out of the property.  Thus, if the Government establishes by a preponderance

of the evidence at trial that Mr. Gillespie committed those acts from within this District (such as

by sending checks or electronic payments for rent or sending communications about the use of

the stash houses), as it claims it will, then venue would be proper in this District.  See Ramirez,

420 F.3d at 139; see also United States v. Saavedra, 223 F.3d 85, 92-93 (2d Cir. 2000) (venue is

proper in continuing offense cases where the criminal acts bear "substantial contacts" with the

venue).

Accordingly, Mr. Gillespie's motion to dismiss Count 23 for improper venue is denied

without prejudice to renewal if the Government does not present sufficient proof at trial that Mr.

Gillespie committed acts in furtherance of his alleged § 856 violations from within this District.

### B.    Mr. Gillespie moves to strike Racketeering Acts 15 and 16 as improper RICO predicates.

Racketeering Acts 15 and 16 charge Mr. Gillespie with robbery under New York Penal

Law § 160.10.  Mr. Gillespie argues that the Second Circuit has held that this statute does not

meet the generic definition for a "robbery" as listed in § 1961(1)(A) and therefore violations of

§ 160.10 are not "racketeering acts."  See United States v. Pereira-Gomez, 903 F.3d 155, 163-64

(2d Cir. 2018).  The Government counters that Pereira-Gomez dealt with the definition of

"robbery" in the sentencing context, and that it is inappropriate to extrapolate its holding to the

RICO predicate context.  The Government also cites Second Circuit case law postdating Pereira-

Gomez holding that New York state robberies can constitute racketeering predicate acts.  See

Speed v. United States, No. 20-cr-3769, 2022 WL 16984680, at *2 (2d Cir. Nov. 17, 2022);

United States v. Laurent, 33 F.4th 63, 88 (2d Cir. 2022).

Regardless of whether there are certain acts that would satisfy the New York robbery statute but would not satisfy the generic definition of robbery under RICO, the acts underlying Acts 15 and 16 – which allege that Mr. Gillespie threatened people with a gun and stole items from them – satisfy both definitions.  Accordingly, those acts are proper RICO predicates, so the motion is denied.

### C.    Mr. Gillespie moves to dismiss all but one each of the charges under Sections 924(c) and 924(j) as multiplicitous.

As the Government notes and Mr. Gillespie concedes, the Second Circuit has held that RICO violations can categorically qualify as crimes of violence.  See Laurent, 33 F.4th at 88-89. The Court is therefore inclined to reject Mr. Gillespie's argument that his alleged RICO violations cannot serve as predicates for the § 924(c) and § 924(j) charges.

Mr. Gillespie further argues that each of his four § 924(c) counts and two § 924(j) counts are based on the same "crime of violence" and "drug trafficking crime;" therefore, the counts are multiplicitous.  This is because, according to Mr. Gillespie, the proper unit of prosecution is the underlying crime, not the number of guns or times guns were used in committing the offense. Although it is possible that some of the § 924 charges arise out of multiple guns used in commission of the same offense or the continuous use of a single weapon in the commission of multiple offenses, rendering those charges multiplicitous, it is also possible that each of the charges relates to the use of a different gun in furtherance of a different act, in which case none of the charges is multiplicitous.  See, e.g., United States v. Mejia, 545 F.3d 179, 205-06 (2d Cir. 2008) (upholding successive § 924 violations brought in the same indictment).  Until the Government presents proof of these offenses at trial, it is difficult, if not impossible, to determine which of those two scenarios is at play here.

As the Court stated in its Order on the pretrial motions, it is premature to dismiss allegedly multiplicitous counts ahead of trial.  See United States v. Josephberg, 459 F.3d 350, 355 (2d Cir. 2006).  Thus, assuming (without deciding) that Mr. Gillespie is right that some of the § 924 charges are multiplicitous because they arise out of the same alleged use of a firearm, the proper course of action is to deny the motion to dismiss those charges at this juncture without prejudice to Mr. Gillespie's renewal after trial if the jury returns multiple verdicts for any multiplicitous counts.

**D.      Mr. Gillespie moves to sever or bifurcate Count 38.**

Mr. Gillespie argues that Count 38, which charges him with violating the felon-in-possession statute (§ 922(g)), should be severed from the trial on the rest of his counts.  In the alternative, he requests that the trial be bifurcated, with the first portion of trial addressing all counts against him except for Count 38, which should be tried in the second portion of trial.  The thrust of Mr. Gillespie's argument on this score is that the Government has not tied his alleged possession of a firearm as charged in Count 38 to any of the other charges in the indictment, making joinder improper under Fed. R. Crim. P. 8(a).

The joinder standard is capacious – offenses may be joined where they are of similar character, are based on the same transaction, or constitute parts of a common scheme.  The Second Circuit has specifically held that felon-in-possession counts can be joined to other counts relating to the possession or use of a firearm, giving courts discretion to decline to sever those counts.  See United States v. Page, 657 F.3d 126, 132 (2d Cir. 2011).  The Government contends that the weapons implicated in the felon-in-possession counts were used in commission of at least some of the other alleged offenses, which is a compelling indication that Count 38 is of a similar character to the other counts.

5

To the extent that Mr. Gillespie is concerned that evidence pertaining to the felon-in-possession count will spill over into the other counts against him, that risk is particularly low here, since the other crimes that Mr. Gillespie is charged with are more serious than the fact that he has previously been convicted of a felony.  And the Court will further mitigate any potential spillover prejudice by instructing the jury that evidence pertaining to the felon-in-possession count shall only be considered in determining Mr. Gillespie's innocence or guilt as to Count 38. There is no need to sever or bifurcate that count from the rest of the counts against Mr. Gillespie, so his motion is denied.

## II.    Mr. Kennedy's [1480] Partial Motion to Dismiss

Mr. Kennedy moves to dismiss Count 35 of his indictment, arguing that pursuant to New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022), § 922(g)(1) is unconstitutional as applied to him.

The Second Circuit held in United States v. Bogle, 717 F.3d 281 (2d Cir. 2013), that § 922(g)(1) – the statute under which Count 35 arises – does not run afoul of the Second Amendment.  Mr. Kennedy's motion raises the question of whether the Supreme Court's recent decision in Bruen disturbs that holding.  I join many of my colleagues in this District in concluding that it does not.  As those colleagues and many other judges across the country have explained, "[t]he Bruen majority opinion makes abundantly clear that Heller and McDonald stand as controlling precedents" and that Bruen itself is "consistent" with those precedents.  See United States v. Warren, No. 22-cr-231, 2023 WL 5978029, at *3 (E.D.N.Y. Sept. 14, 2023) (cleaned up).

Accordingly, Mr. Kennedy's motion to dismiss is denied.

III.     **Mr. Ayers's [1481] Omnibus Motion *in Limine***

A.     **Mr. Ayers moves to exclude photographs of murder victims.**

Mr. Ayers moves to exclude certain graphic photographs of murder victims because they are irrelevant, cumulative, and unduly prejudicial under Fed. R. Evid. 403.  In the alternative, Mr. Ayers requests that the Court "at least" ensure the photographs are "limited to issues that the Government can demonstrate are relevant to the issues at trial."

Mr. Ayers's alternative request is unnecessary – Rule 402 states that only relevant evidence is admissible, and Mr. Ayers can object at trial to any evidence that he believes violates that Rule.  As for his initial request, the Court cannot make a definitive Rule 403 ruling without reviewing all the photographs at issue (to determine whether they are unfairly prejudicial or will mislead the jury) or understanding what other evidence will have been presented at the time the Government seeks to introduce the photographs (to determine whether they are cumulative).

The Government states that it only intends to use a "small selection of crime scene and autopsy photographs" that will provide probative value and corroborate witness testimony.  For example, the photographs in question will feature the clothing that the victims were wearing at the time of their deaths and the locations of the alleged murders.  Although I cannot make a Rule 403 determination about these photographs without reviewing them and understanding how, if at all, they supplement (or duplicate) other evidence introduced at trial, the Government's proposed uses seem proper under Rule 403 and necessary to prove essential elements of its case. Needlessly duplicative evidence will be excluded at trial, especially where that evidence carries a heightened risk of prejudice, which graphic pictures of murder scenes very well may.  But, as the Government notes, Mr. Ayers is not entitled to sanitize all evidence against him through stipulation (setting aside the fact that is too early to know what he and his co-defendants will stipulate to), and the Government is entitled to offer evidence that adds context to the charges,

including graphic photographs, within the limitations of the evidentiary rules. Given the Government's proposed justification for introducing these photographs and the impracticability of conducting a Rule 403 analysis at this point, I deny Mr. Ayers's motion to exclude without prejudice to renewal when the Government seeks to introduce the photographs at trial.

**B. Mr. Ayers moves the Court to require the Government to provide Mr. Ayers and the Court with statements from co-defendants that it intends to use against Mr. Ayers.**

The Government assures the Court that it does not plan to admit any confessions from co-defendants or other Bully Gang members that refer to Mr. Ayers, which moots his motion insofar as it pertains to confessions. With respect to non-confession disclosures, including text messages and social media posts, the Government argues that Mr. Ayers's motion is premature, as those statements will be included on the Government's exhibit list. I agree with the Government on both fronts. Mr. Ayers's motion is denied without prejudice to renewal after reviewing the Government's exhibit list.

**C. Mr. Ayers moves to dismiss several counts for improper venue.**

Mr. Ayers moves the Court to dismiss Counts 23, 28 through 32, and 34 for improper venue. The Government does not dispute that venue is improper for Counts 32 and 34; therefore the motion is granted and those two counts are dismissed without prejudice for the Government to renew them in a proper venue. Mr. Ayers's motion to dismiss Count 23 is denied for the same reasons I denied Mr. Gillespie's motion on the same issue.

Counts 28 through 31 charge Mr. Ayers with maintaining four different stash houses in Maine. The venue analysis for those counts at this stage is identical to the venue analysis for the charge that Mr. Gillespie maintained a New Jersey stash house. Because I find that maintaining a stash house is a continuing offense and the Government alleges that Mr. Ayers committed acts in furtherance of maintaining those stash houses from within this District, his motion for

improper venue is denied without prejudice to renewal if the Government does not present sufficient proof at trial that Mr. Ayers committed acts in furtherance of these crimes within this District.

### D.    Mr. Ayers moves to sever or bifurcate his felon-in-possession count.

Mr. Ayers makes the same request as Mr. Gillespie on the same grounds.  For the same reasons that I denied Mr. Gillespie's motion to sever or bifurcate, Mr. Ayers's motion is denied.

### IV.    Mr. Gillespie's [1499] Motion for a Bill of Particulars

Mr. Gillespie moves for a bill of particulars, arguing that the operative indictment does not provide sufficient clarity as to the charges brought against him.  Mr. Gillespie does not address the fact that three of his co-defendants brought timely motions for the same relief ahead of the pretrial motion deadline, including Mr. Kennedy, who filed a motion to "join in his co-defendants' pretrial motions."  The operative indictment has not changed since that date, so it is unclear why Mr. Gillespie did not join his co-defendants' earlier motions or file his own at the appropriate time.  However, I decline to deny his motion on timeliness grounds because it can (and should) be denied on the merits.

As explained in the Court's Order on the parties' pretrial motions, all that is required of an indictment is that it "be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c).  "When an indictment is insufficiently clear, 'Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient detail the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense.'"  United States v. Nordlicht, No. 16-cr-640, 2017 WL 4797829, at *1 (E.D.N.Y. Oct. 23, 2017) (quoting United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987)).  The bar to establish the need for a bill

of particulars is therefore high: a defendant must show that the indictment is so lacking in specificity that the defendant cannot determine the acts of which the indictment accuses him. See United States v. Chen, 378 F.3d 151, 163 (2d Cir. 2004).

Mr. Gillespie fails to meet that high bar. Like his co-defendants, Mr. Gillespie's motion amounts to a request for a "preview of [the Government's] evidence and legal theories," which is more than he is entitled to. See United States v. Donovan, No. 20-cr-374, 2021 WL 5819915, at *4 (E.D.N.Y. Dec. 6, 2021). Because the indictment provides clear notice of the charges against Mr. Gillespie, his motion is denied.

### V.    Mr. Ayers's [1515] Partial Motion to Dismiss

Mr. Ayers's motion to dismiss his § 922(g) charge pursuant to Bruen is denied for the same reasons that I denied Mr. Gillespie's Bruen motion.

### VI.    Mr. Kennedy's [1558] Partial Motion to Dismiss

Mr. Kennedy joins his co-defendants in moving to dismiss certain charges for improper venue. Specifically, he moves to dismiss Counts 23, 32, and 35. Mr. Kennedy's motion to dismiss Count 23 is denied for the same reasons I denied Mr. Gillespie's motion on that issue, and his motion to dismiss Count 32 is granted for the same reason I granted his co-defendants' motions on that issue. Count 32 is therefore dismissed without prejudice as to Mr. Kennedy for the Government to renew it in a proper venue.

Mr. Kennedy also moves to dismiss Count 35 for improper venue. Count 35 charges Mr. Kennedy with violating the felon-in-possession statute "within the District of New Jersey and elsewhere." Unlike the charges for maintaining a stash house, it is difficult to imagine acts that Mr. Kennedy could have committed in this District that would have been "in furtherance" of possessing a gun in the District of New Jersey, short of Mr. Kennedy actually possessing a firearm in this District. However, because the Government charges Mr. Kennedy with

10

committing this offense in "the District of New Jersey and elsewhere," it is possible that the Government will introduce evidence that "elsewhere" includes this District, in which case venue would be proper both here and in New Jersey.  The Court therefore denies the motion to dismiss without prejudice to renewal if the Government does not present sufficient proof at trial that Mr. Kennedy violated § 922(g) in this District.

**VII.    The Government's [1482] Omnibus Motion *in Limine***

**A.    Evidence of the Bully Gang and Defendants' Participation**

The Government provides a non-exhaustive list of evidence pertaining to defendants' alleged involvement with the Bully Gang that it intends to introduce at trial.  The Court reserves decision on the admissibility of some of the Government's proposed evidence until trial, at which point it can conduct a more thorough analysis under the relevant evidentiary rules, and addresses the proposals herein to a) resolve issues that can be analyzed without reference to other evidence introduced at trial; and b) provide guidance as to the factors the Court will consider when ruling on these issues at trial.  Because defendants prepared their opposition papers without having seen much of the Government's evidence, they retain their right to challenge the admissibility of the Government's evidence at trial.

**1.    Cooperating Witness Testimony**

The Government intends to introduce testimony from cooperating witnesses regarding the Bully Gang, including its history, leadership, and operations.  The defendants do not make any categorical objections to this type of testimony, which is appropriate because it is relevant to the alleged racketeering and therefore should be liberally admitted.  To the extent that defendants object to specific testimony, the Court will address those issues as they arise at trial.

2.      **Photographs, Videos, and Social Media Posts Depicting Alleged Gang Activity**

The Government's motion includes several examples of visual and social media that should be admitted to demonstrate defendants' membership in the Bully Gang.  Such evidence is probative of the racketeering enterprise and shall be admitted, although successive pictures, videos, or social media posts aimed only at establishing gang affiliation may become cumulative, justifying exclusion.

3.      **Tattoo Photographs**

Like the other types of affiliation evidence, photographs of defendants' tattoos are probative of their gang membership – the fact that someone has permanently tattooed himself with the name of a gang tends to make it more probable that he is affiliated with that gang. Photographs of tattoos that indicate Bully Gang affiliation, including the name of and initials of the gang, shall be admitted.

The Government also seeks to introduce tattoos to show that defendants have an "affinity for guns and violence" and a "disdain for law enforcement."  This suggests that the Government will use these photographs to imply that defendants have a generalized propensity for criminal behavior and violence, which is impermissible.  For instance, defendant Moeleek Harrell's tattoo that suggests an animosity toward federal law enforcement is not admissible to show that Mr. Harrell was more likely to commit any of his charged crimes, as that would amount to a propensity inference.

Mr. Gillespie's "922g" tattoo, which presumably refers to the statute by the same name that pertains to the illegal sale, receipt, or possession of a firearm, is a closer call.  Mr. Gillespie argues that any evidence of the tattoo should be excluded under Rules 403 and 404, since it is offered "as blatant [and] improper criminal propensity evidence," and any probative value is far

12

outweighed by the prejudicial effect it would have on the jury, especially because Mr. Gillespie is charged with violating § 922(g) in the operative indictment. The Second Circuit has held that it is error to admit a photograph of a defendant's tattoo of a gun to show he is more likely to have committed a specific act of gun violence, as that amounts to an "impermissible propensity inference . . . that the tattoo was probative of an affinity for guns and gun violence." United States v. Smith, 348 F. App'x 636, 638-39 (2d Cir. 2009); see also United States v. Thomas, 321 F.3d 627, 631 (7th Cir. 2003) ("We fail to see how the redacted photo of the tattoo was admitted for any purpose other than to establish [defendant's] propensity to possess guns. The district court's reasons for admitting the photograph, as well as the additional reasons the government provides, all circle back to one basic proposition – because [defendant] tattooed a pair of revolvers on his forearm, he is the kind of person who is likely to possess guns."). By contrast, courts have held that a tattoo depicting a distinctive firearm is admissible to show that a defendant owned or used that firearm, which is different than a general propensity to own or use firearms. See United States v. Mackey, 249 F. App'x 420, 427 (6th Cir. 2007).

This case is closer to Smith and Thomas than it is Mackey. If Mr. Gillespie's tattoo depicted a specific instance in which he illegally possessed a firearm or depicted a specific firearm he is alleged to have possessed, evidence of that photograph would likely be admissible. Here, the tattoo depicts a statute criminalizing gun possession, which is logically similar to a tattoo depicting a gun. Just as it would be improper to introduce a tattoo of a gun to suggest Mr. Gillespie is more likely to illegally possess one, it is impermissible to use the "922g" tattoo for the same propensity inference. Indeed, the Government suggests that its very purpose in offering evidence of the tattoo is to promote that inference by showing Mr. Gillespie's "affinity for guns and violence." Accordingly, the Court excludes evidence of that tattoo under Rule 403.

### 4.     Song Lyrics

The Government seeks to introduce at least one rap song performed by a self-proclaimed Bully Gang member that allegedly "confirm[s] the existence of the enterprise, and contain[s] admissions about the gang's criminal activity."  The Government reads the lyrics as conveying the Bully Gang members' loyalty, a general practice of "hunt[ing] down" and "violently assault[ing]" gang rivals, and a motive for killing the person who killed YB (an alleged Bully Gang member).

As one court recently opined, "the relevance of rap lyrics as trial evidence depends on the existence of a specific factual nexus between the content of rap music and the crimes alleged." United States v. Jordan, No. 20-cr-305, 2024 WL 343970, at *4 (E.D.N.Y. Jan. 30, 2024).  Here, there is a clear distinction between lyrics that refer to specific events (such as providing the Bully Gang's potential motive to avenge YB) from lyrics about generic lawlessness ("that .40 cal gonna slump a n****").  The former type of evidence is admissible, but the latter is not.

Subject to connection as co-conspirator statements, the Government may introduce certain lyrics from "Who Real As My Gang" for the limited purpose of showing that Bully Gang members had a motive to kill YB's killers.  Those lyrics allude to a specific criminal motive tied to one of the allegations in this case, and therefore are sufficiently probative (and not unduly prejudicial) to merit inclusion under Rule 403.

On the other hand, the lyrics that "explicitly promote the gang and the loyalty of its members" should be excluded on two grounds.  First, the song's performer (and presumptive lyricist) is not a defendant in this case.  As a result, the song lyrics amount to hearsay offered to prove the truth of the matter asserted – namely, that the Bully Gang is violent and promotes lawlessness.  Second, the lyrics are of the type that should be excluded because they are too likely to be fictional braggadocio.  Courts should be cautious about treating lyrics from any

musical genre as factual accounts of people or events; this is particularly true in the context of rap music, where commercial pressures incentivize emcees to embellish their songs with hyperbole and even fabrication about supposed criminal activity. See id. at *3. The same is true of lyrics that allegedly show defendants' "efforts to hunt down" rivals and "violently assault them." Those lyrics read more like vapid posturing than confessions or plans about specific criminal conduct. Therefore, they shall also be excluded.

If the Government intends to introduce additional lyrics at trial, the Court will determine their admissibility upon defendants' objections.

### 5. Recorded Jail Calls

The Government intends to introduce recorded jail calls between certain alleged members of the Bully Gang, including several who were charged in the operative indictment in this case. The Government contends that these statements are admissible as co-conspirator statements.

Defendants argue that those conversations should be excluded as hearsay because they constitute "idle chatter" that was not in furtherance of any conspiracy. Defendants also reiterate their request for the Court to order the Government's advanced disclosure of any such statements that the Government intends to introduce at trial.

Statements by a co-conspirator are "in furtherance" of the conspiracy within the meaning of Rule 801(d)(2)(E) if they apprise another co-conspirator of the progress of a conspiracy. See United States v. Rahme, 813 F.2d 31, 35-36 (2d Cir. 1987); see also United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002) (statements that "inform . . . [co-conspirators] of the status of the conspiracy are in furtherance of the conspiracy within the meaning of [Fed. R. Evid.] 801(d)(2)(E)"); United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994) (same). However, a statement is not made "in furtherance" of a conspiracy when it amounts to nothing more than "idle chatter." Compare United States v. Diaz, 176 F.3d 52, 85 (2d Cir. 1999) (co-conspirator

statements indicating that a murder was committed were not "idle chatter") with United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001) (witness's hearsay account of co-conspirator's joking reference to attempted arson, two years later, was "idle chatter").

As an initial matter, it is unclear from the Government's motion *in limine* what portions of what jail calls it intends to introduce at trial. The Government makes various references (some of them fleeting) to jail calls throughout its motion without explaining the precise statements it seeks to introduce as evidence. The Court cannot make an *in limine* ruling on unspecified jail calls in the abstract, so it defers ruling on the statements contained in the jail calls until trial. However, the Court notes that some of the jail call statements mentioned in the Government's motion would be considered co-conspirator statements "in furtherance" of a conspiracy. For example, in a jail call between Mr. Harrell and Joell Joyce, the former updated the latter about the assault of Tyquan Lane. This appears to be a "status update" apprising another co-conspirator about the progress of a conspiracy. See Rahme, 813 F.2d at 35-36. The same is true of a jail call between Mr. Harrell and Mr. Gillespie, where the former updated the latter regarding the murder of a Stukes Crew member known as "Longhead."

In any event, defendants may renew their objections when the Government introduces jail calls at trial. When there are specific statements before the Court, it will be able to rule on their admissibility under Rule 801(d)(2)(E).

### 6. Legal Tactics

The Government seeks to introduce evidence of "legal tactics" used by the Bully Gang to establish defendants' "use of the justice system to preserve and protect the gang and its members," including evidence that certain members made bail payments and reclaimed seized property on behalf of other members. The Government also alleges that gang members

collectively used a "Bully Gang lawyer" to the same end and intends to offer evidence about their use of "house counsel" without identifying that lawyer.

Defendants respond that evidence of legal tactics is not probative of any relevant issue in the case, since reclaiming items and paying for bail and legal fees on behalf of others is not illegal. Further, defendants argue that references to a "Bully Gang lawyer" without identifying who that lawyer is will confuse and distract the jury, and that this category of evidence carries a high possibility of prejudice. As for the Government's proposal to withhold the Bully Gang lawyer's alleged identity, defendants express concern that the Government would be inviting jurors to speculate as to who that lawyer is, "casting a specter of criminality" or perceived gang allegiance over all attorneys representing defendants in this case.

With respect to the Government's request to introduce generic evidence about a Bully Gang lawyer without identifying that lawyer, I agree with defendants that doing so would invite jurors' prejudicial speculation, unfairly hampering defense counsel's credibility.

However, the analysis is different if the Government identifies that lawyer. Proof of house counsel and benefactor payments (i.e., payments for legal services rendered to others) "can be used by the government to help establish the existence of the criminal enterprise under RICO." United States v. Locascio, 6 F.3d 924, 932-33 (2d Cir. 1993). But the Government has not identified specific "proof" of the existence of house counsel or benefactor payments; rather, it gestures vaguely to "the gang's practice of making benefactor payments" and cooperating witnesses' "understanding that [the attorney] was the Bully Gang lawyer." Without more, the Government cannot take advantage of the line of cases they cite on this score. For example, in Locascio, the Second Circuit considered defendant's clear admission that he incurred thousands of dollars in legal fees for representation of others, whom the lawyer in question represented.

Here, where there is no evidence that the payments are particularly large, the concerns in Locascio over the lawyer's disloyalty are not present.  See also United States v. Gotti, 771 F. Supp. 552, 560 (E.D.N.Y. 1991) (defendant had paid "significant sums of money for legal services rendered to others").  Moreover, unlike in In re Grand Jury Subpoena Served Upon Doe, 781 F.2d 238, 251 (2d Cir. 1986), the Government does not present evidence that any payment for legal representation constituted a form of compensation to Bully Gang members.  See also United States v. Castellano, 610 F. Supp. 1151, 1159 (S.D.N.Y. 1985) (court considered that jury may conclude that benefactor payments were "a cost of doing business").  At bottom, the risk of prejudice in identifying a "Bully Gang lawyer" or "house counsel" for the gang substantially outweighs any probative value it would have.  Any evidence on this topic is, therefore, excluded.

The Government also seeks to enter evidence regarding Bully Gang members making bail payments and reclaiming seized property, including vehicles, on behalf of other gang members.  Although the Court cannot make a ruling on this evidence in the abstract, I note my agreement with defendants that there is "nothing illegal about posting bail for others or assisting to reclaim seized property."  The Government admits that it wants to use these payments and assistance as enterprise evidence to demonstrate the existence of, and defendants' membership in, the Bully Gang.  The Government has a more serious problem on its hands if it needs such evidence to demonstrate the existence of the gang and, as defendants note, the danger of unfair prejudice is high if this evidence is admitted.

## B.    Other Acts Evidence

### 1.    Violence Against Women

This category includes evidence that Bully Gang members intentionally recruited sex workers to participate in the Maine drug conspiracy and psychologically, physically, and sexually abused them.  The starkest example of abuse is a video that allegedly depicts Mr. Ayers

repeatedly using a taser on a woman.  According to the Government, this evidence is probative of why people joined the Maine drug conspiracy, the Bully Gang's method of recruitment, and why people continued to participate in the conspiracy.

Defendants respond that this evidence should be excluded because it is not relevant to the charged conduct and is highly prejudicial.  They note that rape and violence against women are categorically different than the charged offenses and that introducing evidence of that conduct is likely to distract and provoke a strong emotional response that could leach into the jury's assessment of guilt for the charged conduct.

The Court does not doubt that this evidence is probative of the issues that the Government says it is – the question is whether those issues are relevant to the charged offenses. Sexual abuse is not related to the elements of any crime with which the defendants are charged. Its probative value is therefore minimal and far outweighed by the prejudicial impact of admitting such evidence.  Evidence of the alleged, uncharged sexual abuse shall be excluded under Rules 403 and 404.

The analysis for evidence of physical violence differs for two reasons.  First, physical violence is more relevant to the charged conduct than is sexual violence.  Second, because defendants are accused of committing violent crimes (which is not the case for sexual violence), evidence of additional physical violence is unlikely to cause undue prejudice.  Thus, subject to the exception below, the Government's evidence of physical violence shall be admitted.

The video of Mr. Ayers repeatedly using a taser on a woman stands out among the alleged incidents of violence against women as particularly prejudicial.  From the parties' description of the video, the video does not depict the use of physical violence to coerce compliance with the drug trafficking scheme so much as it depicts torture.  Such conduct, while deplorable, is not

relevant to the charged conduct.  Rather, it depicts Mr. Ayers (and, by proxy, the other defendants) as ruthless, which welcomes prejudice from the jury to use the video as impermissible propensity evidence.  With this heightened risk of prejudice in mind and recognizing that the Government will be able to introduce other evidence to contextualize the participation of women in the Maine scheme, the Court excludes the video as unduly prejudicial in comparison to its low probative value.

### 2.     Money-Making Schemes

The Government moves to admit evidence that is related to but not explicitly charged as racketeering activities, including evidence of identity fraud, credit card fraud, and selling marijuana.  Defendants do not appear to contest this evidence, which is admissible as direct evidence of the alleged racketeering activity, even though defendants are not charged with committing fraud or selling marijuana.  Therefore, evidence of uncharged money-making schemes will be admissible at trial.

### 3.     Obstruction of Justice

The Government includes three examples of defendants' alleged obstruction of justice. First, Mr. Harrell allegedly attempted to intimidate a witness in a state prosecution by sending discovery materials to a third party and asking that third party whether he intended to testify against Mr. Harrell in that case.  Second, Mr. Harrell allegedly accessed materials relating to a cooperating witness in a case against another Bully Gang member and distributed those materials to others.  Third, members of the Bully Gang allegedly uploaded a video to YouTube in which they read aloud the court transcript of a witness's testimony, deemed that witness a "rat," and called cooperators "snitches."

First, with respect to the witness intimidation, Mr. Harrell responds that the person who he allegedly intimidated "denied they were the person [testifying]" and that "nothing was done to

the person." Both responses miss the mark. The reason that the Government argues the intimidation is relevant is because witness tampering is probative of consciousness of guilt. See United States v. Perez, 387 F.3d 201, 209 (2d Cir. 2004). The fact that the recipient of the text denied involvement does not change the allegation that Mr. Harrell attempted to dissuade that individual from cooperating, and the fact that Mr. Harrell did not physically harm this witness does not erase his alleged intimidation attempt.

However, both the Government and Mr. Harrell fail to address the fact that the alleged witness intimidation occurred in connection with a state case surrounding alleged crimes that the Government does not bring against Mr. Harrell in this case. Witness tampering is probative of consciousness of guilt for the crimes about which that witness may testify. Here, those crimes involved a murder that Mr. Harrell is not charged with and of which he was acquitted in the state case against him. The witness tampering is not probative of his guilt of any crime in this case, so it may not be introduced for that purpose. However, evidence of witness tampering would be relevant to show that Bully Gang members engaged in attempts to silence witnesses and evade detection (so long as the Government can establish that Mr. Harrell's actions should be attributed to other members of the enterprise), which goes to the nature of the racketeering. If the Government seeks to introduce evidence on this theory, the Court will instruct the jury to consider such evidence for that limited purpose.

Second, as for the Government's argument about Mr. Harrell accessing and distributing documents pertaining to a cooperating witness in a different case against another Bully Gang member, Mr. Harrell did not provide a response. The Government claims that this incident "shows [Mr. Harrell's] motivation to protect this Bully Gang member due to their connection as members of the same racketeering enterprise." That justification misreads the evidentiary rules.

Rule 404(b) states that evidence of other acts is admissible to prove motive.  For example, in a murder case, the Government can introduce evidence that defendant committed another uncharged crime in front of the victim to argue that his motive for murdering the victim was eliminating a witness.  But what the Government cannot do is say the defendant murdered a different person, and that murder appeared to be motivated by a desire to eliminate a witness, so this murder must have had the same motive.  That would be using evidence of another act "in order to show that on a particular occasion the person acted in accordance with [that trait]."  That is the Government's argument here, and Rule 404(b) expressly prohibits it.  However, like the other instance of witness tampering, this evidence is admissible for the limited purpose of showing the nature of the Bully Gang, subject to the Government establishing that Mr. Harrell's actions should be attributed to the rest of the enterprise.

Third, the YouTube video in which Bully Gang members mockingly read witness testimony and malign cooperating witnesses is allegedly attributable to defendants as co-conspirators.  As the Court has already held, co-conspirator statements will be admitted subject to connection.  See United States v. Geaney, 417 F.2d 1116, 1120 (2d Cir. 1969).  If these statements can be attributed to defendants through their co-conspirators, the statements are otherwise admissible, as they are relevant for the same reason that Mr. Harrell's alleged witness tampering is relevant (i.e., they go to the nature of the alleged racketeering enterprise).  The statements in this video shall therefore be conditionally admitted in accordance with the Geaney protocol.

## 4.    Prior Arrests, Convictions, and Incarceration History

The Government intends to introduce the criminal history of the defendants, including prior arrests, convictions, and periods of incarceration.

### i.    Mr. Harrell

The Government seeks to introduce Mr. Harrell and deceased Bully Gang member YB's 2008 indictment and conviction in the Western District of Virginia for conspiracy to traffic cocaine base to "show[] the longstanding criminal relationship between two central members of the Bully Gang enterprise."  Mr. Harrell argues that the arrest occurred 16 years ago and is prejudicial because of its similarity to the charges in the operative indictment.  The Court previously deferred ruling on this conviction pending further information.  As stated in that Order, to introduce a conviction after 10 or more years, the Government must demonstrate that its probative value substantially outweighs its prejudicial effect.  Fed. R. Evid. 609(b)(1).  The Government has not explained why the fact that a 16-year-old conviction with another now-deceased gang member is probative of the operative charges against Mr. Harrell.  The Court is not compelled that this is relevant background, as its only purpose would be to prejudice Mr. Harrell.  The Government may not introduce evidence of this conviction.

The Government seeks to introduce the fact that Mr. Harrell was incarcerated from September 2015 to May 2017 to explain why he waited two years after the death of YB before allegedly targeting John Doe #3, who he believed killed YB in September 2015.  Mr. Harrell counters that this evidence is prejudicial because Mr. Harrell was falsely charged and eventually acquitted during the period in question.  The Government may introduce the fact that Mr. Harrell was incarcerated during that period because it is relevant to the timing of John Doe #3's murder, but they may only introduce that evidence for the limited purpose of contextualizing the alleged murder's timing.  If the Government introduces that fact, Mr. Harrell may introduce that he was acquitted of the charges underlying that incarceration.  Alternatively, the issue may be streamlined by a stipulation stating that "Mr. Harrell was incarcerated from September 2015 to May 2017; he was acquitted of the charges that led to that incarceration."

23

The Government seeks to introduce Mr. Harrell's 2017 arrest with Mr. Ayers as probative of their criminal relationship in 2017, which is when the Government alleges they conspired to kill Bully Gang rivals and John Doe #3.  The arrest took place at 1625 Fulton Street in Bedford-Stuyvesant, and the Government says it will establish at trial this location as a central point of operation for the gang's Brooklyn activities.  The Government also points out that Mr. Harrell admitted in a recorded jail call that he had a gun in the car at the time of his arrest, which is proof of his possession of a firearm in connection with the racketeering activity (as charged in Count 3 of the operative indictment).  Mr. Harrell argues that this arrest was for criminal trespass and possession of a small amount of marijuana, and no contraband was recovered from the vehicle; further, the jail call the Government mentions was unrelated to this arrest.  The Government may introduce the arrest only if it is using it as evidence that the location in question was important to the gang's activities.  Mr. Harrell may renew his objection if the Government attempts to introduce this evidence for another purpose.  With respect to the jail call, the Court defers ruling on its admissibility, because the Government fails to explain how Mr. Harrell's admissions during the jail call related to this particular arrest (not to mention when the jail call took place or who the other person on the line was).

The Government seeks to introduce Mr. Harrell's September 2018 arrest, or at least the fruits of that arrest, for possessing firearms found in a "trap" compartment in Mr. Harrell's car. The Government has three purposes for offering this evidence: (1) it tends to show Mr. Harrell possessed guns during the charged period of racketeering activity; (2) the vehicle in which the guns were found is the same vehicle used in the charged murder of the Stukes Crew members; and (3) the use of trap cars was part of the Bully Gang's *modus operandi*.  Mr. Harrell counters

24

that he was acquitted of all charges stemming from this arrest, so double jeopardy and collateral estoppel prevent the Government from offering this evidence.

These arguments are without merit.  There is no double jeopardy because Mr. Harrell is not being charged with the same crime.  And unless the jury answered a special interrogatory finding that there was no trap compartment in the car, which seems highly unlikely, we cannot even begin to consider collateral estoppel.  If the Government has admissible evidence tending to show that Mr. Harrell knew what a trap car was during the period in question, that he used this particular trap car, or that it contained guns, it does not matter where that evidence comes from.

But a warning to both sides, particularly the Government: This Court is not going to retry the state court case.  I do not know and have not been told the nature of those charges nor the evidence supporting and refuting them; Mr. Harrell's perfunctory reference to a supposed jury finding suggests there was some contrary evidence about who or what was in the car.  If Mr. Harrell wants to keep out the Government's evidence, he is going to need to give me a detailed proffer of what he would offer to show that there was no trap compartment, or no guns, or no Mr. Harrell in the car.  If the Court is convinced that introduction of this evidence would turn into a mini-trial before the jury, it is not coming in.

Next, the Government seeks to introduce Mr. Harrell's incarceration since 2019 as direct evidence of the charged Rikers Island trafficking scheme, in which the Government alleges Mr. Harrell had drugs brought to him by Rikers guards and visitors.  Mr. Harrell argues, *inter alia*, that this evidence is unduly prejudicial.  The baseline fact that Mr. Harrell was incarcerated during the pendency of a significant portion of the charged conduct – specifically, running a drug trafficking scheme at Rikers Island – is highly probative, and the Government may introduce it for this purpose.

25

Finally, The Government seeks to introduce evidence of Mr. Harrell's other 2018 and 2019 arrests, during which cellular devices relevant to the instant charges were seized. The Court defers ruling on this motion, as it is likely to be mooted by stipulation as to the devices' authenticity and chain of custody. If the parties are unable to reach such a stipulation, the Court will revisit this motion at trial.

### ii.   Mr. Ayers

The Government seeks to introduce Mr. Ayers's 2007[1] New York felony conviction for armed robbery in the second degree as direct evidence of the predicate felony required for the felon-in-possession count against Mr. Ayers. As stated *supra* at Section III.D, the Court has denied Mr. Ayers's request to sever his felon-in-possession count (Count 34). But because the conviction is more than 10 years old and the Government has not explained why it is probative of any charged conduct, see Fed. R. Evid. 609(b)(2), I grant Mr. Ayers's request that evidence of the 2007 New York felony conviction be limited to a stipulation setting forth the fact of conviction.

The Government also seeks to introduce evidence of the 2017 Brooklyn arrest of Messrs. Harrell and Ayers against Mr. Ayers. I incorporate herein my above ruling on this conviction as to Mr. Ayers in addition to Mr. Harrell.

### iii.   Mr. Gillespie

The Government seeks to introduce the same 2007 New York felony conviction of Mr. Ayers against Mr. Gillespie. As with Mr. Ayers, the Court denies Mr. Gillespie's request to sever his felon-in-possession count (Count 38). For the same reasons set forth above, evidence of this conviction shall be limited to a stipulation setting forth the fact of conviction. Because the Court

---

[1] The Government states that Mr. Ayers was convicted in 2008. The analysis is the same regardless of whether the conviction is from 2007 or 2008.

denies the Government's motion to introduce evidence of Mr. Gillespie's "922g" tattoo, see Section VII.3, *supra*, the Court need not reach that element of the Government's tattoo-related argument on this point.

The Government seeks to introduce evidence of Mr. Gillespie's 2013 and 2016 federal convictions in this District for felon in possession of a firearm and sentence to 41 months' imprisonment on the grounds that they serve to explain his "922(g)" tattoo. Again, the Court has denied the Government's motion to introduce evidence of this tattoo, so this argument is moot.

The Government seeks to introduce evidence of Mr. Gillespie's status on supervised release in 2019 and 2020 because it was a "factor in how he chose to undertake the charged offenses and illuminates his state of mind at the time." The Government points to a number of jail calls in which Mr. Gillespie discusses his status on supervised release. It also mentions the proximity of his release from custody to the murder of Mr. Hawley; the Government alleges that Mr. Gillespie's "desire to avoid a return to federal prison" prompted his murder of Mr. Hawley because the latter would likely be arrested for another murder (Paul Hoilett). I'm inclined to agree with defendant's argument that, no matter whether Mr. Gillespie had previously been arrested, he would try to hide that activity. The Government is free to introduce evidence of Mr. Gillespie's taking steps to hide his criminal activity or evade law enforcement, but I agree with Mr. Gillespie that those arguments are the same without reference to the fact that he was on supervised release at the time, and find it would be unduly prejudicial to introduce that fact. Therefore, unless the Government can demonstrate that Mr. Gillespie's status on supervised release is relevant for another reason at trial, it may not introduce evidence of it.

### iv.    Mr. Kennedy

The Government seeks to introduce evidence of Mr. Kennedy's 2009 felony conviction as direct evidence of the predicate felony required to prove his felon-in-possession count. As with

Messrs. Ayers and Gillespie, evidence of this conviction shall be limited to a stipulation setting forth the fact of conviction.

The Government seeks to introduce evidence that Mr. Kennedy was incarcerated between 2017 and 2019, and that he was on pre-trial release in 2019 and 2020, to show he was under "increased scrutiny" during that period, which is relevant to his "state of mind."  This request is reminiscent of the Government's motion to introduce the same information about Mr. Gillespie, so I deny it for the same reasons: those facts are not probative and are unduly prejudicial.

###    5.    Violence Targeting the Bully Gang

The Government seeks to introduce evidence of violence against members of the Bully Gang, including murders of Bully Gang members, to establish motive for several acts of violence allegedly perpetrated by other members of the Bully Gang.  This includes the murder of YB, as well as violence perpetrated against the Bully Gang by a rival gang, the Stukes Crew. Defendants do not object to this evidence.

Evidence of violence targeting the Bully Gang will therefore be admitted at trial subject to defendants' reserved objections, although the Court notes that defendants do not have a colorable objection under Rule 404(b), since these acts were not perpetrated by defendants.  See United States v. Brady, 26 F.3d 282, 287 (2d Cir. 1994).

###    C.    Statements by Defendants and Alleged Co-Conspirators

This category includes statements made by Bully Gang members to people who will serve as cooperating witnesses at trial, as well as statements made by Bully Gang members (including defendants in this case) on social media and in recorded jail calls.  Among the recorded jail calls are calls between Mr. Ayers (who was not incarcerated at the time of the call) and inmates at Rikers Island, including Mr. Harrell, that took place on April 15, 2020, the day that Mr. Gillespie and Mr. Kennedy allegedly killed Mike Hawley.  Defendants' primary

28

objection is that the Government has not established that the statements were made "in furtherance" of the conspiracy, and thus reflect inadmissible hearsay.

Despite the Government's treatment of this evidence as an independent category, the analysis is the same as it is for the other co-conspirator statements. As defendants point out, statements by nonparties must be "in furtherance" of the conspiracy. Statements made by co-conspirators are admissible subject to connection, in keeping with Geaney, and statements that are contrary to an individual's penal interests are admissible against that individual as statements against interest. To the extent that this Order does not elsewhere address evidence that the Government intends for this category to encompass, including evidence that the Government excluded from its non-exhaustive list, the Court will determine admissibility at trial.

### D.    News Reports

The Government moves to admit news reports about crimes allegedly committed by the Bully Gang. The proposed purpose for this evidence is to demonstrate defendants' states of mind regarding the subjects reported on in the articles, including the death of YB and drug trafficking activity allegedly associated with the Bully Gang. The Government contends that articles about the death of YB are relevant because they identify the individual who shot YB and, after Bully Gang members learned the supposed identity of YB's assailant, they began a plan to kill that individual in revenge. Thus, the Government argues, the articles about YB's death and other alleged crimes committed by the gang are probative of their guilt because they show the defendants were "concerned about being connected to the crimes."

Although the Government has not specified the exact news articles it intends to enter, it is likely that those articles contain information inadmissible for many reasons, including irrelevance, hearsay, and improper legal conclusions. For that reason, the Government may not enter the news articles just because they report on matters relevant to this case. Allowing those

29

news reports to serve as evidence heightens the risk that the jury would treat their contents as established facts, which is especially concerning to the extent the articles incorporate the author's opinions.

However, the Government may introduce the fact that defendants sent news articles to each other or to others, or otherwise reacted to them.  That goes to their state of mind and to their motive for committing the crimes charged.  The articles may need to be redacted to avoid undue prejudice, but they may be highly probative of the sender and recipient's state of mind concerning the subject matter of the articles.  If admitted for that purpose, the hearsay objection will be overcome because it does not matter whether the statements in the articles are true; just that the sender or recipient were exposed to the statements.  Upon defendants' request, the Court will give a limiting instruction to the jury clarifying this point.

### E.     Evidence of Unexplained Wealth

Defendants do not appear to challenge the admissibility of photographs and videos indicating unexplained and significant wealth, which are generally admissible in cases involving alleged narcotics distribution and theft.  The Government correctly argues that such evidence is probative of the fact that defendants may have acquired the wealth illicitly.  This evidence shall be admissible at trial, so long as it is non-cumulative.

### F.     Preclude Defense Arguments and Evidence

The Government moves to preclude defendants from introducing evidence regarding prior dismissals or acquittals of cases against them.  Although the Government styles its motion as applying to all defendants, it is clearly directed at Mr. Harrell, whose "motion practice and arguments" in this case supposedly evince an intent to make arguments to the jury regarding his prior acquittals and dismissals.

This motion is premature because Mr. Harrell has not yet stated that he will seek to introduce such evidence.  Nevertheless, the Court notes that cross-examination about prior prosecutions that resulted in acquittals is generally impermissible, as "the only purpose served by permitting the inquiry is to place before the jury the allegation of misconduct contained in the prosecutor's question, an allegation the jury will be instructed has no evidentiary weight." United States v. Schwab, 886 F.2d 509, 513 (2d Cir. 1989).

Despite this, Mr. Harrell implies that the Government intends to introduce the fact that he was arrested without providing the additional context that he was acquitted of those charges.  As previously stated, it would be unduly prejudicial for the Government to introduce the fact that a defendant was arrested for a crime of which he was ultimately acquitted without disclosing the fact of acquittal.  In any event, consistent with the Government's proposal, if it becomes necessary to introduce testimony from prior criminal proceedings at trial and the Court finds such testimony admissible, the parties shall refer to any prior trials or hearings as "prior proceedings" without reference to the defendants, charges, or outcomes of those proceedings. This is standard procedure and surely counsel are familiar with referring to materials from earlier trials as "prior proceedings."

The Government also moves to prevent defendants from introducing or making arguments about their own exculpatory statements, attacking the Government's investigation, referring to potential punishment if the jury convicts, and other references to improperly elicit juror sympathy.  These requests are premature.  However, the defense counsel in this case are all highly experienced, and they know what they are not allowed to do and the consequences of violating the basic rules of trial conduct.  The Court does not expect to be tested with the kind of matters to which the Government has alluded.

31

### G.      Discovery Schedule

The Government urges the Court to order defendants to disclose exhibit lists one week before the start of trial (citing Fed. R. Crim. P. 16(b)) and witness statements two days before a witness testifies (citing Fed. R. Crim. P. 26.2).  For the purpose of expediting what will be a lengthy trial rather than having to take frequent breaks while the Government tries to catch up, defendants are directed to provide witness statements and exhibits upon which a witness will be questioned by 7:00 p.m. two days before the witness testifies.

## VIII.   The Government's [1497] Partial Motion to Dismiss

The Government moves to dismiss the 18 U.S.C. § 924(c)(A)(iii) charge (but not the 18 U.S.C. § 924(c)(A)(i) and (ii) charges) in Count 3 as to Mr. Gillespie and Mr. Johnson only.  The Government also moves to dismiss the 18 U.S.C. § 924(c)(A)(ii) and (iii) charges (but not the 18 U.S.C. § 924(c)(A)(i) charge) in Count 3 as to Mr. Kennedy only.  The motion is granted.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
          March 17, 2024