UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                                           :
THE UNITED STATES OF AMERICA,                              :
                                                           :
                                                           :     **MEMORANDUM DECISION AND**
                        -against-                          :     **ORDER**
                                                           :
DERRICK AYERS, *et al.*,                                   :
                                                           :     20-cr-239 (BMC)
                               Defendants.                 :
--------------------------------------------------------- X

**COGAN**, District Judge.

        Defendants Moeleek Harrell, Derrick Ayers, Franklin Gillespie, and Anthony Kennedy

have filed post-trial motions for a judgment of acquittal under Rule 29 or for a new trial under

Rule 33.  For the following reasons, their motions are denied.

        The charges arose out of defendants' participation in the "Bully Gang," a violent drug-

trafficking enterprise operating in New York, New Jersey and Maine.  The trial spanned three

months.  The government presented 51 witnesses, and defendant Harrell testified on his own

behalf.  Because the evidence presented at trial was voluminous and mostly not relevant to the

pending motions, I will recount below only what is necessary to address defendants' points of

error.

        After twelve days of deliberation, the jury returned a verdict convicting each defendant of

racketeering based on various predicate acts.  Additionally, the jury convicted defendants of

various conspiracies and/or substantive crimes involving drugs, firearms, assault, murder, money

laundering, and bribery.  The jury deadlocked on other charges that are being held in abeyance

pending disposition of these motions.

In support of their motions, defendants mostly rehash their closing arguments to the jury, and the new arguments they advance do not hold water.  Accordingly, they have not met the high standard for a new trial under Rule 33, and they certainly have not met the even-higher standard for an acquittal under Rule 29.  I address first their evidentiary challenges before turning to their claims of legal error.

## DISCUSSION

### I.    Factual Challenges

#### A.  Standard of Review

A court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(c).  The Second Circuit has oft repeated that a criminal defendant challenging the sufficiency of the evidence underlying his conviction bears a heavy burden.  See United States v. Masotto, 73 F.3d 1233, 1241 (2d Cir. 1996).  "Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt' may the court enter a judgment of acquittal."  United States v. Jabar, 19 F.4th 66, 76 (2d Cir. 2021) (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)).  The court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  Id.  And the court "must analyze the evidence in conjunction, not in isolation, and apply the sufficiency test to the totality of the government's case and not to each element, as each fact may gain color from others."  United States v. Raniere, 55 F.4th 354, 364 (2d Cir. 2022).

2

The standard for a new trial under Rule 33 is only slightly less onerous. The rule allows district courts to grant a new trial "if the interest of justice so requires," including when "a conviction . . . is against the weight of the evidence." Tibbs v. Florida, 457 U.S. 31, 38 n.12 (1982). This affords a court some flexibility. For instance, in some "exceptional circumstances" a district court can "intrude upon the jury function of credibility assessment" when evaluating a Rule 33 motion. United States v. Bell, 584 U.S. 478, 483 (2d Cir. 2009) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). Yet the court's broader discretion should still "be exercised sparingly." Id. "All the facts and circumstances must be taken into account; "[a]n objective evaluation is required"; and "[t]here must be a real concern that an innocent person may have been convicted." Id.

**B. Existence of a Racketeering Enterprise**

I begin with Ayers' contention that the government failed to prove the existence of an enterprise. He argues that the Bully Gang was a "group of young aspiring rappers" who just so happened to separately commit a series of crimes – namely, the Maine drug operation, the Rikers drug smuggling and the resultant money laundering, and various murders and robberies. These crimes, in his view, have no connection to each other or to the Bully Gang itself. To put this in RICO terminology, Ayers argues that the government did not establish vertical relatedness, *i.e.*, that any charged racketeering acts related to the Bully Gang, or horizontal relatedness, *i.e.*, that any charged racketeering acts related to each other. See United States v. Polcanco, 145 F.3d 536, 541 (2d Cir. 1998). Although his conclusion is catchy – "They proved the dots. They failed to connect them" – he is wrong.

Let's get one thing straight; there was most definitely a criminal enterprise here. The evidence of vertical relatedness was overwhelming. The communications between gang

members alone undercut Ayers' "rap group" defense eight ways from Sunday. The government introduced social media posts from Bully Gang members bragging about criminal activities, the gang's access to firearms, obtaining large amounts of money from illegal activities, credit card scamming operations, and more. There was very little rapping discussed among these defendants but lots of boasting about their crimes. At best (from Ayers' perspective), the jury could have come out either way on the enterprise issue, but it is not a serious argument to question its conclusion.

Ayers is on barely stronger footing in challenging the horizontal connectedness between the predicate crimes. And his stronger footing is due only to the fact that the criminal activities of this gang were so pervasive, and the gang was such a central part of its members' lives, that it was difficult to differentiate which crimes they were committing for themselves individually and which they were committing on behalf of the gang. Nevertheless, the evidence of linkage was more than sufficient to let the jury conclude beyond a reasonable doubt that these crimes were interrelated. Stash houses, cars, gang members, fake credit cards, punishments, gang disputes – all spanned multiple criminal activities undertaken on behalf of the gang. If, for example, a car was used to transport people or drugs from New Jersey to stash houses in Maine, and then used again in a shootout with a rival street gang, that is enough to connect those events to each other and, in turn, to the enterprise. See United States v. Payne, 591 F.3d 46, 64 (2d Cir. 2010). The evidence showed that there were specific vehicles used to commit many of the criminal acts that Ayers contends were "unrelated," but if the same tools are used to commit multiple crimes for the benefit of the enterprise's members that is an indicator of relatedness on which the jurors could (and did) rely.

Similarly, it was fine for Ayers to argue that the murder conspiracies were "personal" and not related to the Bully Gang, but it was not a miscarriage of justice for the jury to disagree. The evidence permitted it to so conclude beyond a reasonable doubt. As I discuss more thoroughly below, there was outright gang warfare between the Bully Gang and the Stukes Crew, and the jury could find – indeed, it could hardly avoid finding – that extensive Bully Gang personnel and resources were committed to track and attempt to assassinate Christopher Stukes.

Ayers cannot use the extensive scope of the Bully Gang's criminal activities to defend against relatedness. The jury was properly instructed on the issue, and the evidence was ample to support its conclusion.

### C.  The Chris King Shooting

Starting with Ayers and Harrell's challenges to the Chris King shooting, I turn next to defendants' arguments trained on specific racketeering acts. Chris King was an enemy of the Bully Gang. The evidence showed that, in 2015, he shot to death one of the gang's founders, Charles Williams. The evidence further permitted the jury to conclude that the gang, led by Harrell and Ayers, were determined to seek revenge. Text messages between the pair included a photograph of King at a court appearance, and images from Harrell's phone revealed that he had previously looked up when King would appear in court. King's lawyer testified that King saw several individuals at this court appearance and appeared alarmed by their presence. When Harrell testified on his own behalf, he conceded that he had researched King's court appearances and went to court to find him. Why? The jury drew the obvious conclusion.

On another occasion, Ayers sent Harrell a map showing that Ayers was outside King's house in Queens. Ayers texted Harrell to "fill up before you get there," which the jury could have reasonably interpreted to mean "bring a loaded weapon." Other text messages showed that

Harrell did in fact receive directions to King's house. Several days later, King was shot while leaving a restaurant in Queens. Phone records showed a call between Harrell and Ayers almost immediately before the shooting.

A victim accompanying King testified that the shooters' car was a blue Kia, and evidence showed that Ayers owned a blue Kia that Harrell used, according to Harrell's own testimony, "a lot." Ayers had a subscription to a vehicle tracking device (who knows why), and the tracker showed the car was at the scene of the shooting. It further showed that, after the shooting, the Kia drove to a house known to be used by Harrell's mother at which, again according to his testimony, he also lived.

Little more needs to be said about Harrell's and Ayers' attacks on this evidence. The record is self-explanatory, and their responses to it are paltry.[1] The strongest argument in either brief is Harrell's point that the government never established a connection between him and Rondale Wells, the person from whom law enforcement recovered the gun used in the shootings. But I cannot conclude that the jury's verdict was against the weight of the evidence, and by extension that the evidence was insufficient to support a conviction, merely because the government did not prove its case in a particular way. Sure, its case might have been stronger had it explained precisely how Wells came into possession of the gun. But it was under no obligation to introduce such proof. Indeed, the government tied Harrell to the weapon in a different manner; it presented a photograph, recovered from Harrell's phone, of his then-

---

[1] Particularly paltry is Harrell's attack on the evidence that Ayers and Harrell attended King's court appearance. This evidence is "self-negating," Harrell's brief bizarrely argues, because it shows that "members of the Bully Gang would have had a clear shot at [King] going in and out of the courthouse had they wanted to take it, [and] no one attempted to harm him." It doesn't take much to think of a reason why one might hesitate to shoot a gang rival in a courthouse.

girlfriend holding the gun.  Alongside the voluminous evidence connecting Harrell to the shooting, the government's showing was more than sufficient to go to the jury.

### D.  The Stukes Crew Shooting

Similarly, Ayers and Harrell challenge the sufficiency of the evidence supporting their convictions related to a shootout with another drug-distribution gang known as the "Stukes Crew," eponymously for one Christopher Stukes.  The rivalry between the Bully Gang and the Stukes Crew was well-established in the Bully Gang's social media posts, and it resulted in several shooting incidents, including the death of one Stukes Crew member, Jonathan Jackson. One hour before the first of these shootings, Ayers sent Harrell a message disclosing Christopher Stukes' license plate number, and Harrell messaged back a photograph of Stukes's car.  Again, Ayers' tracker showed the Kia before, during, and after the shooting, and one of those locations was on the block where the shooting occurred.  The shooting was captured on a news video feed and included footage of Ayers' Kia, leading Ayers to text another gang member, "[i]t's over for my car."

Like with the Chris King shooting, this evidence speaks for itself.  Ayers tried to portray the shootings, or some of them, as a personal dispute between Harrell and the Stukes Crew, but the intra-Bully Gang discussions about the rival gang were so extensive and the use of gang resources and personnel were so pervasive that it is no wonder that the jury rejected his argument.  See United States v. Laurent, 33 F.4th 63, 77 (2d Cir. 2022).

### E.  The Maine Operation

Individually, Harrell argues that the government did not establish that he participated in the Maine wing of the Bully Gang's drug operation.  It is difficult for the Court to grok why Harrell is raising this argument because there was so much evidence of his involvement in the

charged drug trafficking and money laundering conspiracies. There are text messages between him and his co-conspirator Tyquan Lane about the type and number of drugs being sold from various stash houses in Maine. The messages also showed that Harrell had sent a woman who became a cooperating witness to pick up drugs from one of the Maine stash houses.[2] Cell site data allowed the jury to conclude that he went to the stash house in Portland. Perhaps most damningly, Harrell sent Ayers a media report of the police search of a Maine stash house – just mutual curiosity?

Harrell has no response to the overwhelming evidence of his involvement and indeed direction in these racketeering activities – that is, aside from cherry-picking the evidence, attempting to discredit the government's witnesses, and generally construing the evidence in his favor, which of course gets the Rule 29 and 33 standards exactly backwards. See Jabar, 19 F.4th at 76; Bell, 584 U.S. at 483. I therefore cannot disturb the jury's sound verdict on this count.

### F. The Bully Gang's Drug Operations

Gillespie too claims that the government did not sufficiently prove that he participated in the Bully Gang's racketeering activities. Relying on Reeves v. Ernst & Young, 507 U.S. 170 (1993), and United States v. Praddy, 725 F.3d 147 (2d Cir. 2013), Gillespie first contends that the evidence was insufficient to show he was involved in the "operation" of the Bully Gang. He characterizes the Bully Gang as a drug operation and, once so characterized, attempts to show that he was not that involved in the drug aspects of the gang (apparently maintaining that his activities were limited to murder conspiracy and firearms violations).

---

[2] Of course, as Harrell points out, this cooperating witness later testified that she was unaware of Harrell's involvement in the Maine operation. But the messages provide an alternative basis for the jury to conclude Harrell was nevertheless involved.

Even accepting his characterization of the Bully Gang – and ignoring the murderous means by which it accomplished its drug activities – the argument is wholly without merit. Gillespie was convicted of maintaining a Bully Gang stash house, a separate count of drug trafficking conspiracy, and a racketeering act of drug trafficking conspiracy. These were all Bully Gang activities. His firearms and murder conspiracy convictions were also related to the Bully Gang's drug business.

To the extent Gillespie is arguing that he wasn't a "director" or "leader" of the Bully Gang, that may spare him a sentencing enhancement if successful, but it has nothing to do with his liability for the crime. Reeves itself establishes the common-sense notion that "[a]n enterprise is operated not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." 507 U.S. at 184. As he had to do, faced with the overwhelming evidence, Gillespie conceded in his opening statement that he was a member of the Bully Gang, and he has not walked that back in his post-trial motion. He was consistently involved in and kept abreast of the gang's activities. Most importantly, he was more than a flunky. The evidence showed that he is better characterized as middle management rather than lower-level operator. He took over for the gang's leaders when they were imprisoned. He provided assurances to gang members about the reliability of other gang members. He even gave orders to lower-ranking Bully Gang members during the 2020 robberies discussed below.

Gillespie does not meaningfully dispute the government's careful recitation of the record evidence showing his involvement in many aspects of the Bully Gang's drug and other illegal activities. His level of involvement was more than sufficient to support the jury's verdict.

### G.  The Roosevelt Avenue Stash House

Gillespie next contests the evidentiary support for the charges arising out of his maintenance of the Roosevelt Avenue stash house.  The evidence, however, was again overwhelming.  He made social media posts from that location (or at least the jury could so find) that showed him dumping huge stacks of cash out of a duffel bag onto a couch in the house.  The government's evidence showed those videos were posted just two days after Gillespie returned from a trip to Maine.  Expert cell-site testimony showed him making over 400 calls from the area of the stash house and showed that he went to and from the stash house before and after the murder of Paul Hoilett and Mike Hawley.  A cooperating witness placed him there.

The jury therefore did not need to get to a Pinkerton theory to find Gillespie guilty of maintaining the stash house and possessing the drugs there; the evidence was sufficient to find that he was a direct participant.  But the jury was properly instructed on that theory, and Pinkerton effectively refutes any remaining argument from Gillespie that his involvement was too insubstantial to support direct liability.  See United States v. Smothers, 652 F. Supp. 3d 271, 301 (E.D.N.Y. 2023).  The jury could have easily concluded that Gillespie should have reasonably foreseen the purpose for which his coconspirators were using the stash house.  See Masotto, 73 F.3d at 1239.  His frequent presence there just didn't wash with the idea that he was an unwitting house guest.

As to Gillespie's venue objection, the Court overruled that pretrial and adheres to that ruling on the same basis.  The evidence allowed the jury to find by a preponderance that the Bully Gang was headquartered in Brooklyn and that the headquarters organized and stocked the Maine stash houses.

### H.  The Hoilett and Hawley Murders

Gillespie and Kennedy's arguments related to the Hoilett and Hawley murders are also baseless.  According to the government, Mike Hawley was a Bully Gang member who murdered one Paul Hoilett.  Cell site data showed that Gillespie, driven by Kennedy, met with Hawley shortly before the murder, and then Gillespie and Hawley travelled together to Hoilett.  After the murder, when Hawley got nervous that the "feds" were looking for him (even though they were not) and expressed his nervousness to Gillespie, Gillespie reported Hawley's skittishness up the chain and ultimately tied off the loose end by murdering Hawley.  Cell cite data again indicated that Kennedy drove Gillespie to the scene of the crime.

The jury hung on four counts against Gillespie related to these murders: two counts for the illegal use of firearms during their murders, and two counts for causing Hawley and Hoilett's deaths.  It similarly hung on the two counts against Kennedy related to the Hawley murder: one count for using a firearm and one count for causing Hawley's death.  Gillespie and Kennedy renew their Rule 29 motions as to these counts.

As evidenced by the jury's indecision, the government's case was not bulletproof.  But heaps of evidence tied both defendants to the murders and both murders to the Bully Gang. Kennedy and Gillespie met at a gang stash house before the murders; they left together in one of the gang's trap cars; they communicated with other gang members during the crimes; and they returned to the stash house immediately afterwards.  Further, Gillespie was in constant contact with Ayers as he waited inside Hawley's vehicle minutes before Hoilett's murder, and both Gillespie and Kennedy were in close contact with other Bully Gang members immediately before and after Hawley's murder.

Although the jury did not decide one way or the other, it would not be manifestly

unreasonable to conclude that the murders were both related to the other racketeering acts and to

the Bully Gang itself. Gillespie identifies the biggest hole in the government's case – that it

introduced no evidence explaining *why* the Bully Gang wanted Hoilett dead. The relatedness

evidence is so strong that a rational jury could have still concluded the crimes were RICO

predicates.

## I. The 2020 Gunpoint Robberies

The final batch of factual challenges I must address concern two gunpoint street robberies

committed in 2020. Gillespie's counsel admitted during summation that Gillespie perpetrated

these robberies. (He pretty much had to, as both robberies were captured on video.) The jury

found that the robberies were racketeering acts supporting a RICO conviction, and it returned a

guilty verdict on various firearm charges related to the robberies.

Seeking acquittal or, alternatively, a new trial on the RICO count, Gillespie first argues

that the government failed to show how the robberies were connected to his role in the Bully

Gang. The jury was instructed that, to find Gillespie guilty of these racketeering acts, it had to

find "some meaningful connection between the defendant's illegal acts and the affairs of the

enterprise" – exempla of which could be that "the defendant's position in the enterprise enabled

his commission of those illegal acts and the racketeering acts had some impact or effect on the

enterprise" or "that the defendant was able to commit the acts solely by virtue of his position or

involvement of [sic] the enterprise's affairs." His post-trial motion argues that the evidence does

not show such a connection.

After carefully reviewing the parties' submissions and the evidence presented at trial, I do

not agree. There was clear evidence that other Bully Gang members participated in at least the

second robbery.  As Gillespie admits in his reply, he committed that robbery with fellow Bully Gang member Latrell Johnson, and their getaway driver was an associate of the gang.  A recorded call even revealed that Gillespie asked Harrell whether Johnson would be up for the job, to which Harrell responded that Johnson was "sturdy" and "one of us."

True, the government was not able to reveal Gillespie's accomplices to the first robbery.  But plenty of other evidence formed a basis for reasonably concluding that the robberies are "interrelated by distinguishing characteristics and are not isolated events.'"  Laurent, 33 F.4th at 75.  During both robberies, Gillespie wielded the same two weapons – a pistol and a larger firearm with an extended magazine – and he and his accomplices drove the same Nissan sedan.

Even setting all these similarities aside, the post-robbery social media posts alone provided both a vertical connection to the gang and a horizontal connection to the other racketeering acts.  After the second robbery, Gillespie, Johnson, and the driver each posted videos and pictures featuring stacks of stolen cash and captions referencing the Bully Gang – "We da bullies dat bully the bullies," for one.  On their face, the posts suggest that the robberies were committed to reinforce the Bully Gang's status.  That inference is then strengthened by the posts' timing.  Because the robberies were committed shortly after gang leaders like Harrell and Ayers had been arrested, the jury could infer that they were part of an effort by gang members on the outside to show the world that the Bully Gang was still alive and well.  This tactic was common within the Bully Gang – the government introduced evidence of other social media posts bragging about cash received from other racketeering acts.  In sum, the jury was more than justified in concluding that Gillespie did not commit the robberies only to line his pockets, but rather to bolster the Bully Gang's vulnerable reputation.

Gillespie makes two other attempts to overturn his convictions based on the 2020 robberies, but neither is persuasive. First, he argues that the evidence was insufficient to show he brandished a gun. Severely undercutting this argument is the evidence that two guns matching those used in the video were recovered from Gillespie's car one month after the robberies. The jury could rationally conclude they were the same guns, especially since it also heard one of the robbery victim's testimony to the same effect.

Second, Gillespie challenges his conviction for illegally possessing firearms. Contrary to his argument, he wasn't just charged or convicted of having one firearm found at a stash house. He was charged with having constructive possession of seven other firearms and a box of ammunition. The jury expressly found, pursuant to a <u>Pinkerton</u> instruction, that Gillespie possessed these firearms in furtherance of a charged drug trafficking conspiracy in which Gillespie participated. It was clearly foreseeable to Gillespie that the gang possessed such guns. <u>See</u> <u>Masotto</u>, 73 F.3d at 1239. The evidence established that Gillespie knew that Ayers, Harrell and other gang members had been involved in shootings for years; that Gillespie had regularly been at one of the stash houses where guns and ammunition were found; and that Gillespie had used trap cars to conceal firearms. It is, again, no wonder that the jury rejected Gillespie's argument to the contrary.

## II.    Legal Challenges

### A.  Standard of Review

A district court's legal error can provide a basis for a new trial under Rule 33. <u>See</u> <u>United States v. McPartland</u>, 81 F.4th 101, 123 (2d Cir. 2023). The usual Rule 33 considerations still apply; a new trial is warranted only when the error, or cumulative errors, yielded a "seriously erroneous" conviction. <u>United States v. Mensah</u>, 110 F.4th 510 (2d Cir. 2024). As

always, the Court "must exercise the Rule 33 authority sparingly and [only] in the most extraordinary circumstances." United States v. Ferguson, 246 F.3d 129, 135 (2d Cir. 2001).

### B. Pre-Verdict Instructions

First up is Ayers and Kennedy's challenge to the Court's pre-verdict jury instructions. They argue that the Court impermissibly directed the jury's deliberations by instructing it to answer special interrogatories, which asked whether each defendant committed the underlying racketeering acts, before determining whether each defendant was guilty of Count One, the RICO charge. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." United States v. Jimenez, 96 F.4th 317, 322 (2d Cir. 2024). If an initial instruction is adequate, any supplemental instructions are erroneous only if they are so "incomplete and misleading . . . as to make the charge, viewed as a whole, inadequate." United States v. Hastings, 918 F.2d 369, 371-73 (2d Cir. 1990).

Specifically, Ayers and Kennedy take issue with one of the court's responses to Juror Note 17. A juror asked, "[a]s a technical question in completing the verdict sheet," whether the jury should "mark 'Proven' on the form if we find the event or action described took place, but was not part of the racketeering and the enterprise?" Or "put another way," the note went on, "if [the jury] mark[s] 'Proven' on the Verdict Sheet for two or more Racketeering Acts charged per defendant, will Count One automatically be 'Guilty' or, if two acts are proven but not found to be connected to a pattern of racketeering, will Count One be 'Not Guilty'?"

After discussing the issue with the parties, the Court answered each question separately. Responding to the first question, it stated that "as a matter of process, we want you to go through each of the racketeering acts listed in Count 1 and mark it proven or not proven, and then you will conclude whether or not it was part of the racketeering pattern or whether there was an

enterprise." The Court further directed the jury to review the written jury instructions on this matter. It responded to the second question, which the juror posed as "putting it another way," with the following:

> [I]f you mark proven on the verdict sheet for two or more of the racketeering acts charged per defendant, will Count 1 automatically be guilty[?] The answer to that is no. There still has to be an enterprise, there still has to be a pattern of racketeering activity, and the act still has to be connected to it. Then you continue to say[:] or if two acts are proven but not found to be connected to a pattern of racketeering, will Count 1 be not guilty? And the answer to that is yes.

Defendants contend that the first answer effectively instructed the jury how to deliberate and "gave undue and misguided significance to the determination of the racketeering acts."

Preliminarily, defendants' reading of the instruction is incorrect. The juror's question was a "technical" one that related only to "completing the verdict sheet." The Court's answer was also technical and unrelated to deliberations. It explained how the jurors should fill out the verdict sheet, not how they should deliberate. Defendants seemingly understood this at the time – their contemporaneous objection focused on whether the jurors should mark "proven" next to racketeering acts that it found unconnected to the enterprise. If Ayers and Kennedy had issue with the jurors potentially considering the special interrogatories before deciding guilt on Count One, like the defendants in United States v. Spock, 416 F.2d 165 (1st Cir. 1969), they had ample opportunity to raise that objection before submitting the verdict sheet, on which the special interrogatories preceded Count One, to the jurors.

In any event, defendants offer no support for their proposed rule barring district courts from allowing juries to answer special interrogatories before returning a verdict. They cite cases approving the use of post-verdict interrogatories in RICO cases. See, e.g., United States v. Scarfo, 41 F.4th 136 (3rd Cir. 2022); United States v. Udeozor, 515 F.3d 260 (4th Cir. 2008). But those cases do not address the use of pre-verdict interrogatories. They cite an over-forty-

16

year-old non-precedential opinion which notes that "[i]t may be worth considering" instructing the jury to answer the special interrogatories "only in the event that the jury has agreed upon a general verdict of guilty."  United States v. Ruggiero, 726 F.2d 913, 928 (2d Cir. 1984) (Newman, Circuit Judge, concurring in part and dissenting in part).  But the opinion "approv[es] the use of an interrogatory to identify proven predicate acts in complex RICO trials" and recognizes that "[t]he procedure to be followed when an interrogatory is used in a criminal trial should be within the discretion of the trial judge."  Id.

To be sure, courts express "general disapproval" of special interrogatories in criminal cases for a reason.  Ruggerio, 756 F.2d at 926.  Sometimes, breaking a charge down into its component elements "may propel a jury toward a logical conclusion of guilt, whereas a more generalized assessment might have yielded an acquittal," and sometimes special interrogatories "make resolution of a single fact issue determinative of guilt or innocence, without regard to the elements of an offense."  Id.; see also Spock, 416 F.2d at 182.  Special interrogatories can even work against the government, as noted in Judge Newman's Ruggiero partial concurrence.  See 726 F.2d at 927 n.3 ("I think it more likely that a jury, generally inclined toward conviction by unflattering evidence about the defendant or by his vague connection with the alleged offense, might be impelled to acquit if obliged to record its determination of the existence of the elements of the offense where the evidence concerning one or more elements is questionable.").  That said, the Second Circuit has "recommended" using special interrogatories in certain cases.  United States v. Pierce, 940 F.3d 817, 821 (2d Cir. 2019).  It has even noted that interrogatories are "extremely useful" in complex, multi-defendant RICO trials like this one.  Ruggiero, 726 F.2d at 922-23.

17

Clearly, then, the Court had discretion to instruct the jury to answer the interrogatories in any non-prejudicial manner. Yet defendants cannot explain how the oral instruction prejudiced them. They hypothesize that the Court's answer "forced the jury to focus on the predicate acts instead of considering the entirety of the RICO charge holistically." In doing so, they overlook completely the Court's answer to the second question, which reminded the jury that "[t]here still has to be an enterprise, there still has to be a pattern of racketeering activity, and the act still has to be connected to it." They also overlook the Court's written instructions to the same effect, which it even referenced in its response. The answer was perfectly consistent with the governing law and the jury's obligations; it did not render "the charge, viewed as a whole, inadequate." Hastings, 918 F.2d at 371-73.

Separately from their order-of-deliberations argument, defendants contend that the Court's first answer contradicted a line in the initial written instructions informing the jury that "[i]f you find a charged defendant guilty of racketeering, you must reach, as to that defendant, separate verdicts of proven or not proven with regard to each of the alleged racketeering acts on the verdict sheet." That instruction, they argue, tells the jury to come to a verdict on Count One, and then fill out the special interrogatories. Their conclusion is doubly wrong. First, the written instructions do not direct the jury to deliberate in any particular manner. They simply provide that a verdict sheet with a "guilty" finding on Count One should also have findings on each of the predicate acts. Second, as I have already explained, the oral instruction did not direct the jury to deliberate in any particular manner. I therefore find no error in the Court's response to Juror Note 17.

### C.  Post-Verdict Interrogatories

I turn next to Ayers and Harrell's claims that the Court erred in allowing the jury to revisit the special interrogatories after delivering the first partial verdict and in accepting a second partial verdict.  As evidenced by the scant caselaw cited by defendants in support, these challenges are unfounded.  A verdict is complete "to the extent findings are made."  Simms v. Village of Albion, 115 F.3d 1098, 1105 (2d Cir. 1997).  The jury was thus free to reconsider any special interrogatories or additional counts for which it did not make a finding on the first partial verdict.  It did not "revise" its first partial verdict by, for instance, finding a defendant guilty of Count One in the second partial verdict after making no finding in the first verdict.  See Ohio v. Johnson, 467 U.S. 493 (1984).  This argument is especially baffling coming from Ayers, who spends much of his brief scolding the court for *failing* to instruct the jury to consider the special interrogatories only after returning a verdict on the RICO count.

Somewhat relatedly, Ayers contends that his conviction for unlawful firearm possession should be vacated because the jury did not make a finding on the related RICO predicate act. This argument too fails.  It is a basic tenant of criminal law that a jury may return "mutually irreconcilable" verdicts.  United States v. Martinez, 110 F.4th 160, 172-73 (2d Cir. 2024).

### D.  Harrell's Remaining Legal Challenges

I need no more than a few paragraphs to address and reject the remaining claims of legal error, all of which are raised by Harrell.  First, Harrell argues the Court erred in precluding his counsel, Darren Fields, from cross examining one of the cooperating witnesses who testified about the Maine operation, Amanda Walton.  Fields had previously represented Walton in connection with New York firearm and drug charges and with extradition warrants out of

Pennsylvania and Maine.  Harrell contends that because the cross examination would not have touched on any subject related to Fields' representation of Walton, the Court violated Harrell's Sixth Amendment right to counsel by requiring Fields' co-counsel to examine Walton.

As the cases on which Harrell relies acknowledge, the Court had discretion to disqualify Fields after balancing "the interests of the defendant, the witness . . . the government[,] and the public."  United States v. Falzone, 766 F. Supp. 1265, 1273 (W.D.N.Y. 1991).  Weighing heavily towards prohibiting Fields' cross examination, Walton had a strong interest in disqualification. Walton refused to waive the attorney-client privilege, and Fields' representation of her related directly to the charges against Harrell.  Walton was arrested at the Bully Gang headquarters, the firearms she was convicted of possessing were recovered from the headquarters, and Ayers paid Fields to represent Walton.[3]  Of course, the Court considered and credited Fields' promise that he would not rely on any confidential information or touch on any subject matter related to his prior representation, but "[e]ven the most rigorous of self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it to telling advantage in the subsequent litigation."  Emle Indus., Inc. v. Panantex, Inc., 478 F.2d 562, 571 (2d Cir. 1973).

Harrell, in turn, did not provide a compelling reason why substituting in Fields' co-counsel for the Walton cross would prejudice him.  Nor does he now in his brief.  Citing United States v. Gonzalez-Lopez, he claims that he does not have to show evidence of prejudice.  The Court deprived him of his counsel of choice, he argues, which is a structural error that warrants a new trial *per se*.  But this argument is circular.  Gonzales Lopez says an *erroneous* disqualification is a structural error.  Harrell cannot rely on it to establish that the Court's

---

[3] The Court mistakenly stated at the sidebar that Harrell, not Ayers, paid Fields.

decision was in fact erroneous; indeed, the parties in in Gonzales-Lopez agreed that the disqualification there was improper.

Further crippling his claim, Harrell acknowledged at his Curcio hearing that Fields likely could not examine Walton. Judge Kuo reminded Harrell that Fields "won't be able to cross-examine [Walton] in a way that would make that witness look bad," that Fields "is going to be ethically . . . bound to refrain from certain questioning and certain avenues of inquiry that if he had never represented [Walton] would not be an issue in this case," and that "none of us can foresee how [the Court] may rule with respect to whether and how Mr. Fields' cross-examination is ultimately limited." Armed with full knowledge of these risks, Harrell consented to Fields' representation.

Next, Harrell argues that that he was prejudiced by "the admission of an enormous volume of inflammatory and prejudicial evidence having nothing to do with him." To his credit, the Second Circuit has recognized that in multi-defendant RICO trials such "spillover prejudice" can affect defendants who are responsible for only "a tiny sliver" of the charged conduct. See United States v. Tellier, 85 F.3d 578 (2d Cir. 1995). There is just one problem – Harrell was responsible for far more than a sliver of the Bully Gang's conduct. Harrell was charged and convicted of possessing and distributing narcotics, unlawfully possessing and brandishing firearms, and two murder conspiracies. He was no bit player; he was a leader of the gang. Although some of the evidence presented would not have been admissible against him in a solo trial, Harrell falls far short of the "extremely heavy burden" required to establish spillover prejudice. United States v. Griffith, 284 F.3d 338, 351 (2d Cir. 2002).

Harrell's final two claims of error each target one of the Court's pretrial rulings – its decision not to suppress evidence from cell phones seized from him at various traffic stops, and

21

its decision to empanel an anonymous jury, respectively.  Aside from repeating arguments already rejected by the court, Harrell does not make any "showing that the pretrial rulings greatly prejudiced [him] so as to give rise to a concern that an innocent person may have been convicted."  United States v. Flom, 256 F. Supp. 3d 253, 271 (E.D.N.Y. 2017).  Thus, because Rule 33 is not "a vehicle to relitigate pretrial rulings with which he disagrees," he is not entitled to a new trial on either ground.  Id.

## CONCLUSION

For these reasons, defendants' motions for acquittal and a new trial [1907] [1913] [1917] [1918] are denied.

**SO ORDERED.**

_Brian M. Cogan_
U.S.D.J.

Dated: Brooklyn, New York
        January 28, 2025